SCOTT E. BRADFORD, OSB #062824
United States Attorney
District of Oregon
**LEAH K. BOLSTAD, OSB #052039**
Leah.Bolstad@usdoj.gov
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:25-cr-00310-AN** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **ROBERT JACOB HOOPES,** | |
| **Defendant.** | |

On June 14, 2025, defendant made a series of poor choices over the course of roughly thirty minutes. These choices hurt a federal officer and damaged federal property. He threw rocks at the ICE Building. He struck Adult Victim 1, a federal law enforcement officer, in the head with a large rock at point-blank range, causing a large gash above his eye. After committing this aggravated assault, he and two others used a giant metal pole from a stop sign as a battering ram to try to break down the front doors of the ICE Building. Out of all the agitators federally prosecuted from the 2025 unrest at the ICE Building, this defendant's conduct is on the most egregious end of the spectrum. Given the seriousness of this offense, the need to provide just punishment, the need to deter similar conduct, the need to promote respect for the law, and

**Government's Sentencing Memorandum**                                                    **Page 1**

the need to avoid unwarranted sentencing disparities, the government is recommending a 46-month term of imprisonment, a three-year term of supervised release, a $100 fee assessment, and restitution.

## I.    Factual and Procedural Background

### A.    The Offense Conduct

In June 2025, federal law enforcement officers were detailed to Portland, Oregon to assist local Federal Protective Service officers with protecting the ICE Building, a property leased to the United States Department of Homeland Security. This property houses multiple federal agencies and serves as an immigration check-in office for local community members. It is staffed by civilians and law enforcement officers. Some of these agencies investigate complex drug organizations and child sexual predators. In June 2025, the property became the target of protest activity, and at times, certain individuals crossed the line from peaceful protest to violent agitators. These agitators destroyed windows, tagged the walls with graffiti, poured paint on the driveway, and even hit, kicked and shoved federal officers who were shielding vehicles to ensure safe ingress and egress.  Some agitators even set fire to the gate and others tried to trap officers inside the building by barricading the exits.  This is why federal officers from across the country were detailed to this city to protect this property.

Adult Victim 1 (AV1) was and is employed as an Enforcement and Removal Officer (ERO) by the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE) in Texas. On June 14, 2025, AV1 was stationed inside the ICE Building to help protect the building and employees from potential violence.  On that date, a crowd of mostly peaceful protestors gathered at the ICE Building and lawfully exercised their First Amendment rights. However, during the later hours of the afternoon, certain members of this crowd stepped over the

**Government's Sentencing Memorandum**                                         **Page 2**

line and engaged in violent actions directed at federal law enforcement officers and the ICE Building.  Defendant was one of the agitators leading the violent charge.

Defendant was seen on the building's video surveillance cameras throwing very large rocks at the ICE Building door, behind which federal agents were staged. *See* Govt. Exh 1 (Video Clip from E18 – Main Entry – 5:40 p.m.).  He threw four separate rocks over a 5-minute period.  In addition to throwing projectiles, defendant also tried to wedge a "Lime" electric rental scooter between a door to the ICE Building and a retaining wall, in an apparent attempt to prevent officers who were inside the building from egressing.  Every so often, someone inside the building would open the door to move the scooter out of the way.  Each time they did so, defendant and others would throw rocks, water bottles, and other projectiles at the door, trying to hit whoever was opening it. Defendant also used his banner pole to poke at the law enforcement officers trying to open the door. *Id*. at 03:24-3:40. He repeatedly and aggressively advanced on the door to engage the officers inside.

At one point, defendant approached the ICE Building door carrying a gray colored banner

with an unreadable slogan on one side.  He used the banner to push the Lime scooter against the door and tried to poke the banner into the doorway when someone opened the door.  The banner became wedged in the door.  Defendant pounded on the door until someone opened it, then pulled the banner out and immediately tried



to strike whoever was inside the door with it.  A short time later, the door opened again, and defendant reached around the open door and hurled a large baseball sized rock directly at AV1,

**Government's Sentencing Memorandum**                                                    **Page 3**

who was no more than three feet away.  The rock struck AV1 in the face, causing a significant

gash over AV1's right eyebrow. This blow knocked AV1 back and blurred his vision.  He bled

profusely, but he continued to defend against the agitators who were attempting to breach the

door of the building. AV1 required medical attention at the scene to close the gushing head

wound, and again he sought medical attention the next day. PSR ¶ 22.




*Defendant throwing the rock at AV1 (inside).*          *Photograph of AV1's injury.*

   At this close distance and given defendant's lengthy period of throwing items at the ICE

Building, AV1 had a good opportunity to observe defendant.  AV1 provided a description of him

and the clothing he was wearing.  Based on this description, and the footage captured on

surveillance video, it was clear defendant was wearing a black, long-sleeved shirt with the

sleeves rolled up and dark pants.  The shirt had a beige or gray grid pattern.  Defendant also wore

**Government's Sentencing Memorandum**                                                    **Page 4**

a black or charcoal gray work glove on his right hand and a full-face gas mask or respirator with bright pink colored filter cups over his face.  He had a bright blue cloth protruding from the right rear pocket of his pants.

At approximately 5:50 p.m., defendant and two other, unidentified people used an upended stop sign as a makeshift battering ram.  They worked together, moving 10-15 feet backward and forward, and struck the glass door to the ICE building four times with this giant metal pole.  Govt. Exh. 2 (Video Clip from E18 – Main Entry – 5:55 p.m.).  Defendant led this group from the front, and he appeared to be orchestrating the effort to breach the building.  They struck the door with such force that the surveillance camera, mounted on the side of the building well above the door, shook with each strike. After creating cracks in the door, defendant and another attempted to place a cell phone camera at the crack to capture images of what and who was inside.  The door was so badly damaged that it had to be replaced at a cost of $7,747.72.



*Defendant leading the charge with a battering ram. See Govt. Exh 2 (Video Clip)*

**Government's Sentencing Memorandum**                    **Page 5**



*Defendant and others using a battering ram. See Govt. Exh 2 (Video Clip)*

At approximately 6:30 p.m., some 40 minutes after defendant's attempts to breach the door with a battering ram, the Portland Police Bureau declared a riot and directed everyone in the 300-person crowd to leave the area. Many did not leave. Rioters continued to throw projectiles at the building and at federal officers who were trying to protect it. At approximately 8 p.m., another rioter (G.B.) assaulted another federal officer by ramming a wooden stick into the back of his head while that officer was attempting to make an arrest. Like defendant, G.B. is also facing federal charges for Aggravated Assault on a Federal Law Enforcement Officer, and he is pending trial in August.

Defendant was not arrested during this riot, and he left the area on his own accord. Defendant's face is not visible in the ICE Building surveillance footage, as it was obscured by

**Government's Sentencing Memorandum**                                                    **Page 6**

the gas mask he wore. However, still images taken from the surveillance recording captured the pattern on his shirt, the gas mask he wore, and a distinctive tattoo and silver bracelet visible on his left forearm.

 

After this riot, OregonLive.com posted an article about the activities at the ICE Building that included a photo of a person wearing a dark shirt with a grid pattern, a gas mask with pink cups, a silver bracelet, and a forearm tattoo (see photo to the right). AV1 saw that news article, and he identified the man in the photo as the same person who struck him with a rock. Defendant's face was visible in the photo. Investigators later identified this person as



Robert Jacob Hoopes, a Reed College graduate who has the same forearm tattoo.

Investigators located defendant's residence and conducted surveillance. They observed defendant outside wearing short sleeves, revealing the distinctive forearm tattoo and silver bracelet.



On July 25, 2025, just over one month after the June 14 riot, investigators executed a federal search warrant at defendant's residence in Northeast Portland. They recovered the distinctively patterned shirt and the full-face respirator with bright pink or purple filter cups defendant wore at the time of the assault. They also recovered the silver bracelet he wore on his left wrist, as depicted in the Oregonlive.com photo.



Agents also executed a search warrant on defendant's cell phone. In it, they found relevant communications with colleagues. On June 10, 2025, one colleague in a group text sent a link to a Protest Guide (Black Flag), along with a flyer advertising upcoming protest events at the Portland ICE Building. This guide contains a section on militant tactics with recommendations on how to harm officers using lasers and paint. On June 15, the day after the riot, one of defendant's colleagues wrote in a group chat, "there are a bunch of articles that mention what Jacob did today lmfao."[1] Another asked, "what did Jacob do[?]," and defendant responded, "some stuff you shouldn't put in text."

The U.S. General Services Administration received an estimate of the cost of repairing the damaged door at the ICE building. The estimated repair cost was $7,747.72. AV1 sought and

---

[1] LMFAO is a common text message acronym for "Laugh my f***ing a** off."

**Government's Sentencing Memorandum**                                          **Page 9**

obtained medical care for his injury, incurring a $350.00 bill. Defendant has agreed, by plea, to pay these restitution amounts in full.  Plea ¶ 16; PSR ¶ 93.

### B.    The Charge

On August 5, 2025, the grand jury returned a two-count indictment charging defendant with Aggravated Assault on a Federal Employee with a Dangerous Weapon, in violation of Title 18, United States Code, Sections 111(a) and 111(b) and Depredation of Federal Property, in violation of 18, United States Code, Section 1361 and 2. ECF No. 9.  On February 19, 2026, defendant pleaded guilty to Count 1 of the Indictment charging Aggravated Assault on a Federal Employee with a Dangerous Weapon, a violation of Title 18, United States Code, Sections 111(a) and 111(b).

### C.    The Sentencing Guidelines Applied to This Case

By plea agreement, the parties stipulated and agreed to the following guidelines which are accurately reflected in the PSR computations:

| Count 1: 18 U.S.C. §§ 111(a) and 111(b) – Aggravated Assault on a Federal Employee with a Dangerous Weapon | | |
|---|---|---|
| USSG § 2A2.2(a) | Base Offense Level | 14 |
| USSG § 2A2.2(b)(2)(B) | Use of Dangerous Weapon | +4 |
| USSG § 2A2.2(b)(3)(A) | Bodily Injury | +3 |
| USSG § 2A2.2(b)(7) | Conviction Under 18 U.S.C. § 111(b) | +2 |
| USSG § 3A1.2 | Official Victim | +6 |
| USSG §3E1.1(a) and (b) | Acceptance of Responsibility | -3 |
| | Total Offense Level | 26 |

At TOL 26, CHC I, the advisory guideline range is **63-78 months' imprisonment.**

While not bound by the Sentencing Guidelines, district courts must consult them and take them into account when sentencing.  *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738, 767 (2005).  The sentencing guidelines are advisory and one of the statutory factors this Court must consider when imposing a sentence.  *See* 18 U.S.C. § 3553(a)(4); *United States v. Rita*, 551 U.S.

**Government's Sentencing Memorandum**                                    **Page 10**

338, 347-48 (2007).  They serve as "the starting point and the initial benchmark" in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 49 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives."  *Rita*, 551 U.S. at 350.  The guidelines serve as a "lodestar" at sentencing, and "cabin" or "anchor" a sentencing court's discretion.  *Peugh v. United States*, 569 U.S. 530, 542-43 (2013).  While advisory, the Supreme Court has observed that "[c]ommon sense indicates that in general, this system will steer district courts to more within-guidelines sentences."  *Id*.

## II.     Government's Recommended Sentence

Because of defendant's early acceptance of responsibility prior to the second trial setting, and within five months of arraignment, the government recommends a two-level downward variance. Additionally, after his plea and pre-sentencing, defendant authored a letter denouncing the use of violence as an unacceptable form of protest. He acknowledged that he hurt someone. He expressed regret.  He has shared this letter with his community, and it is anticipated he will echo the contents in his allocution at sentencing. This should help deter others from making the same bad choices that he made on June 14, 2025.  This, balanced with all the other 3553(a) factors, leads the government to recommend a 46-month sentence, representing a 3-level downward variance from the advisory guideline range.  Such a sentence appropriately balances the relevant factors under Section 3553(a) and represents a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing.  18 U.S.C. § 3553(a)(2).

### A.     The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment

Defendant committed an Aggravated Assault on a Federal Law Enforcement Officer. This is a very serious offense involving a federal officer victim and defendant's use of a

**Government's Sentencing Memorandum**                                    **Page 11**

dangerous weapon.  It is specifically enumerated as a "crime of violence," under U.S.S.G. 4B1.2(a)(2).  The Sentencing Commission treats this crime more seriously than other assault charges; it has a devoted guideline (2A2.2) with a higher base offense level and higher enhancements than are available in the other two assault guidelines (2A2.3 and 2A2.4).  The advisory guideline scheme clearly treats this crime as more serious than mere felony assault and more serious than felony assault on a federal officer which requires merely "physical contact," as opposed to injury.

The full scope of defendant's relevant conduct in this episode also speaks to the seriousness of the offense. This was not just one rock thrown at an officer. This was not just one bad decision in the heat of the moment. Instead, defendant engaged in protracted aggressive and violent behavior of the course of 20-30 minutes. *See* Govt. Exh. 1 and 2.  With each throw of a large rock at the building, and with each jab of his banner into the doorway, this defendant was the violent aggressor.  And when he was not throwing rocks or trying to wedge a door closed or poke at officers, he was standing at the front of the crowd, taunting the officers and posturing from behind the anonymity of a gas mask. After harming the officer with a large rock at point-blank range, he did not stop. He helped lead a group carrying a battering ram to break the front door down, violently shaking the building and scaring those inside.  The prolonged nature of his violent episode should distinguish this case from other Aggravated Assaults that happen in a split second of time.  Defendant's crime is more serious.  It involved multiple instances of aggression. It involved time for reflection. But defendant chose violence repeatedly.

Defendant's charge of conviction – Aggravated Assault – distinguishes his case from almost every other assault prosecution from the ICE Building in 2025.  Additionally, the enhancements for dangerous weapon *and* bodily injury, distinguish defendant's case from

**Government's Sentencing Memorandum**                                   **Page 12**

virtually every other assault prosecution arising from the 2025 unrest at the ICE Building. Put simply, defendant's crime is more aggravated than the rest. His sentence should reflect this reality.

### B.    The Need to Provide Adequate Deterrence and Protect the Public

In weighing the sentencing factors, deterring future criminal violence at the ICE Building is incredibly important. The community of criminal agitators is relatively small, and the government is confident that they are watching what happens at defendant's sentencing. A serious sentence that aligns with his advisory guidelines sends a strong message to those who are contemplating going to the ICE Building to damage the building and throw projectiles at officers. The significant downward variance suggested by Probation would not afford adequate deterrence to these criminal actors.

This type of crime, committed by a small minority of agitators, puts other members of the public in harm's way. Indeed, defendant's conduct almost created a deadly force scenario. *See* Victim Impact Statement. Rioters assaulting officers and then breaching the doors to a federal facility, with people inside, is a rare occurrence, thankfully. Were it not for the restraint exercised by the federal law enforcement officers in the building that day, this situation could have turned out very badly for defendant and possibly others. The sentence imposed by this Court should weigh heavily the need to protect officers as well as lawful non-violent protestors from harm.

### C.    The Need to Avoid Unwarranted Sentencing Disparities

The guidelines "provide the framework for the tens of thousands of federal sentencing proceedings that occur each year." *Molina-Martinez v. United States*, 578 U.S. 189, 192 (2016). The guidelines were designed to achieve uniformity in sentencing among different courts for

**Government's Sentencing Memorandum**                                                      **Page 13**

similar criminal conduct, as well as promoting proportionality in sentencing through a system that imposes "appropriately different sentences for criminal conduct of different severity." *Id.* (internal quotation marks and citation omitted). They "inform and instruct the district court's determination of an appropriate sentence." *Id.* at 1346.

According to the PSR, in the past 5 years nationwide, there have been 31 defendants in CHC I who were convicted of Aggravated Assault on a Federal Law Enforcement Officer. Of those 31, 28 were sentenced to a term of imprisonment. Ninety percent (90%) of these 28 defendants who, like defendant, were at an advisory guideline range of 63-78 months at TOL 26, CHC I, received on average, a sentence of 49 months' imprisonment, representing a little more than a 2-level downward variance from TOL 26. The median sentence for this population was slightly higher, at 52 months, representing a 2-level downward variance.

The government's recommendation of 46 months is just three months lower than the national average sentence for similarly situated individuals. Defendant's early acceptance of responsibility has significant value to the government, and through the plea agreement, the government rewarded defendant's choice to quickly admit wrongdoing.

More locally, there are not yet any sentenced similarly situated defendants from the 2025 ICE Building unrest.[2] No other sentenced case involved a charged Aggravated Assault, much less one with both a bodily injury and a dangerous weapon. Without these aggravating facts, and

---

[2] There is only one similarly situated individual from the 2025 ICE Building unrest, G.B., and he is pending trial for Aggravated Assault. If he goes to trial and loses, he will not have the benefit of acceptance credit nor early acceptance credit. In that scenario, even though his conduct and criminal history is somewhat similar to defendant's, G.B. may face a much higher range of 87-108 months at TOL 29, CHC I. If he chooses not to accept responsibility, that choice would be reflected in a much higher range, making him distinguishable from this defendant.

**Government's Sentencing Memorandum**                                    **Page 14**

without that aggravated crime, the guidelines for assault drop substantially to a BOL 10, and there is no 6-level official victim enhancement. Thus, almost every other assault case sentenced thus far has produced a TOL that is some 15 levels lower than defendant's TOL. In other words, all other sentenced assault cases from the 2025 ICE Building unrest have involved conduct less aggravated than defendant's. As such, the government sought lower sentences in those cases commensurate with the applicable guidelines.

Indeed, from all the assaults charged from the ICE Building incidents in 2025, this defendant's assault was the most egregious to be sentenced to date. No other sentenced case involved both a dangerous weapon *and* physical injury. The most egregious case should not get a 9-level downward variance. Yet, Probation's recommendation does just that.

### D.    Additional Downward Variances Are Not Warranted

Probation recommends a 9-level downward variance and a sentence of 24 months' imprisonment. In its "Justification" paragraphs, Probation lists several things to support this recommendation, each of which fall into just one of the 3553(a) factors this Court is to balance at sentencing: defendant's history and characteristics. PSR page 2. Probation's recommendation appears to focus exclusively on this one factor - defendant's history and characteristics - while ignoring the stated goals of sentencing that are broader and implicate community needs – the need for the sentence to reflect the seriousness of the offense, the need to deter others from engaging in similar conduct, the need to protect the community, the need to promote respect for the law, and the need to be fair in how we treat similarly situated people.

After listing the facts of defendant's criminal conduct, including the injury caused and damage done, Probation's justification section gives a short list of reasons supporting a far below guideline recommendation. PSR page 2. First, Probation briefly mentions that defendant has no

**Government's Sentencing Memorandum**                                    **Page 15**

criminal history.  The government agrees that this is a good fact for defendant.  However, this fact is already accounted for in the guidelines because, with zero criminal history points, he is in CHC I. Second, Probation reports defendant performed well on pretrial supervision. Performing well is expected of defendants released to pretrial supervision. Other defendants who do well do not receive 9-level downward variance recommendations from Probation, and Probation does not explain why this case is different.

Third, Probation indicates that defendant has a college degree, a part-time job, and a strong support system. On the one hand, these are positives for defendant personally. On the other hand, these facts demonstrate that this defendant should have known better. He knows how democracy works. He understands how to make his voice heard. He has resources and friends and a college education. He is lucky to have these things, and yet, he made a series of very poor choices and engaged in multiple acts of criminal violence. The fact that he has a strong support system is not a fact that should weigh heavily in the balancing of 3553(a) factors and sentencing goals, especially the need to promote respect for the law. Someone with resources and support and education is not more deserving of a sentence 9 levels lower than someone who lacks similar good fortune.

Fourth, in its justification, Probation notes that one member of defendant's family had a mental health diagnosis in defendant's childhood. PSR page 2. There is no further explanation of why or how this fact, on its own or with the first three, supports a 9-level downward variance. Indeed, later in the PSR, the writer notes that defendant had a "delightful" childhood, and his ACE score is 1. PSR ¶¶ 59, 68.

By focusing on merely one factor – defendant's history and characteristics – to the exclusion of all others, Probation's recommendation does not promote respect for the law nor

**Government's Sentencing Memorandum**                                    **Page 16**

does it even attempt to balance the 3553(a) factors. Even with that focus on this defendant and his history, there is nothing particularly persuasive or mitigating about his background. He has no intellectual disability, no mental health problems (PSR ¶ 65), no history of poverty or abuse, and no compelling excuse for his protracted violent conduct in throwing four rocks at the ICE Building, attacking a federal officer with a rock, and then leading a group of men repeatedly pushing a battering ram against a glass entrance to federal property.

## III.    Conclusion

The Court should sentence defendant to 46 months' imprisonment, a three-year term of supervised release, a $100 fee assessment, and restitution in the amounts of $350 to AV1 and $7,747.72 to the property owner. This recommended sentence reflects the seriousness of assaulting a federal officer with a dangerous weapon and causing injury. This sentence tracks the guidelines and the national average sentence for similarly situated defendants. As such, the sentence avoids unwarranted sentencing disparities. A 46-month sentence for this conduct sends a powerful deterrence message to those contemplating engaging in similar violence at the ICE Building. It sends a strong message to those agitators who, seeing these events unfold, sit back and "LMFAO" as a federal property is destroyed and federal officers are assaulted. The government urges this court to impose a 46-month sentence. It will promote, and it may even help restore, respect for the law.

Dated: June 3, 2026                                  Respectfully submitted,

                                                              SCOTT E. BRADFORD
                                                              United States Attorney

                                                              /s/ Leah K. Bolstad
                                                              LEAH K. BOLSTAD, OSB #052039
                                                              Assistant United States Attorney